1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

                            ----oo0oo----

11

12   BRADLEY BRAZILL,                  NO. CIV. 2:12-1218 WBS GGH

13          Plaintiff,                 MEMORANDUM AND ORDER RE: MOTION
                                       FOR SUMMARY JUDGMENT OR,
14      v.                             ALTERNATIVELY, PARTIAL SUMMARY
                                       JUDGMENT
15   CALIFORNIA NORTHSTATE COLLEGE OF
     PHARMACY, LLC, CALIFORNIA
16   NORTHSTATE UNIVERSITY, LLC, and
     DOES 1 through 10, inclusive,

17
            Defendants.
18   _____/

19

20                          ----oo0oo----

21          Plaintiff Bradley Brazill brings this action against

22   defendants California Northstate College of Pharmacy, LLC

23   ("College"), and California Northstate University, LLC ("CNU"),

24   arising from defendants' allegedly wrongful conduct related to

25   the termination of plaintiff's employment.  Plaintiff brings four

26   claims: (1) age discrimination under the Age Discrimination in

27   Employment Act ("ADEA"), 29 U.S.C. §§ 621-634; (2) age

28   discrimination under the California Fair Employment and Housing

                                   1

1    Act ("FEHA"), Cal. Gov't Code §§ 12900-12996; (3) retaliation

2    under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h); and (4)

3    wrongful termination in violation of public policy on the basis

4    of violations of the ADEA, FEHA, and FCA.  (Docket No. 10.)

5         Presently before the court is defendants' motion for

6    summary judgment or, alternatively, partial summary judgment

7    pursuant to Federal Rule of Civil Procedure 56.  (Docket No. 29.)

8    I.   Factual and Procedural Background

9         The College is a private pharmacy college located in

10   Rancho Cordova, California.[1]  (Cheung Decl. ¶ 2 (Docket No. 29-

11   8).)  Alvin Cheung is its President, (id. ¶ 1), and Norman Fong

12   is its Vice President and Director of Operations, (Fong Decl. ¶ 1

13   (Docket No. 29-12).)  In April 2009, the College hired plaintiff

14   as Chair of the Department for Clinical and Administrative

15   Sciences.  (Brazill Decl. ¶ 3 (Docket No. 30-2).)  He was fifty-

16   two years old at the time.  (Id.)

17        During his employment, plaintiff came to believe that

18   College students were using federal student aid from Davenport

19   University to pay for College expenses.[2]  (See id. ¶ 15.)

20   Besides discussing his concerns about this practice with other

21

22        [1]   CNU was formed on December 19, 2011.  (Cheung Decl. ¶ 7
     (Docket No. 29-8).)  It is a separate entity from the College.
23   (Id.)  Defendants contend that because CNU was formed after
     plaintiff was hired, it cannot be his employer.  Defendants then
24   argue that because each of the statutes under which plaintiff
     brings claims imposes liability only on an aggrieved party's
25   employer, summary judgment must be granted in CNU's favor on all
     of plaintiff's claims.  Plaintiff does not oppose CNU's motion.
26   (Opp'n at 1:21 n.1 (Docket No. 30).)  CNU's motion for summary
     judgment will therefore be granted.

27        [2]   Defendants' objections to the evidence underlying this
     fact on the grounds of hearsay, foundation, relevance, and the
28   sham affidavit rule are overruled.

2

College employees, plaintiff told his supervisor, Dean David Hawkins, several times that the practice was "illegal."[3]   (Id.) However, he never expressed his concerns about the issue to President Cheung or Vice President Fong.  (Munoz Decl. Ex. 10 ("Brazill Dep.") at 141:7-13, 142:4-8 (Docket No. 29-5); Cheung Decl. ¶ 12; Fong Decl. ¶¶ 3-4.)

President Cheung made the decision to terminate plaintiff in July 2011.  (Cheung Decl. ¶¶ 13, 16.)  According to President Cheung, the basis for this decision was that plaintiff created a conflict of interest by hiring faculty to work in his private pharmacy, treated another faculty member inappropriately, and vented his frustrations about the College's administration during a visit from an accreditation organization.  (See id. ¶ 13.)  Plaintiff was terminated on July 15, 2011.  (Brazill Decl. ¶ 3.)

After plaintiff's termination, Dean Hawkins hired Sonya Frausto, an assistant professor, to fill plaintiff's former position as Chair of the Department for Clinical and Administrative Sciences.  (See Munoz Decl. Ex. 12 ("Hawkins Dep.") at 56:8-13 (Docket No. 29-5).)  She was thirty-six years old at the time.  (See Munoz Decl. Ex. 13 ("Frausto Dep.") at 56:8-13 (Docket No. 29-6).)  The parties dispute whether her position was interim or permanent.

Sometime later, Dean Hawkins replaced Frausto with James Palmieri, another faculty member at the College.  (See id.

---

[3]    Defendants' objections on the grounds of hearsay, foundation, and relevance to the evidence underlying this fact are overruled.

3

1  at 58:23-24.)   Palmieri was fifty-one years old at the time of

2  his appointment.  (Vera Decl. ¶ 14 (Docket No. 29-10).)

3  II.  <u>Legal Standard</u>

4          Summary judgment is proper "if the movant shows that

5  there is no genuine dispute as to any material fact and the

6  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

7  P. 56(a).  A material fact is one that could affect the outcome

8  of the suit, and a genuine issue is one that could permit a

9  reasonable jury to enter a verdict in the non-moving party's

10 favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

11 (1986).  The party moving for summary judgment bears the initial

12 burden of establishing the absence of a genuine issue of material

13 fact and can satisfy this burden by presenting evidence that

14 negates an essential element of the non-moving party's case.

15 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

16 Alternatively, the moving party can demonstrate that the

17 non-moving party cannot produce evidence to support an essential

18 element upon which it will bear the burden of proof at trial.

19 <u>Id.</u>

20          Once the moving party meets its initial burden, the

21 burden shifts to the non-moving party to "designate 'specific

22 facts showing that there is a genuine issue for trial.'"  <u>Id.</u> at

23 324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

24 the non-moving party must "do more than simply show that there is

25 some metaphysical doubt as to the material facts."  <u>Matsushita</u>

26 <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

27 "The mere existence of a scintilla of evidence . . . will be

28 insufficient; there must be evidence on which the jury could

1 reasonably find for the [non-moving party]." <u>Anderson</u>, 477 U.S.

2 at 252.

3       In deciding a summary judgment motion, the court must

4 view the evidence in the light most favorable to the non-moving

5 party and draw all justifiable inferences in its favor. <u>Id.</u> at

6 255. "Credibility determinations, the weighing of the evidence,

7 and the drawing of legitimate inferences from the facts are jury

8 functions, not those of a judge . . . ruling on a motion for

9 summary judgment . . . ." <u>Id.</u>

10 III. <u>Discussion</u>

11       A.   <u>Age Discrimination</u>

12       The ADEA prohibits an employer from discriminating

13 against an employee who is at least forty years of age because of

14 that person's age.  29 U.S.C. §§ 623(a)(1), 631(a); <u>see</u> <u>Gross v.</u>

15 <u>FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 175-78 (2009) (in a

16 disparate treatment action, plaintiff must prove that his age was

17 the cause in fact of the adverse employment action).  FEHA

18 imposes liability on an employer for discharging an employee over

19 forty years of age because of that person's age.  Cal. Gov't Code

20 §§ 12926(b), 12940(a); <u>see</u> <u>Harris v. City of Santa Monica</u>, 56

21 Cal. 4th 203, 232 (2013) (plaintiff must prove discrimination was

22 a substantial motivating factor in employment decision).

23       There are two ways for a plaintiff to avoid summary

24 judgment on a disparate treatment claim.  The plaintiff may

25 produce direct evidence of discrimination, <u>see</u> <u>Enlow v.</u>

26 <u>Salem-Keizer Yellow Cab Co.</u>, 389 F.3d 802, 812 (9th Cir. 2004),

27 or may proceed under the burden-of-proof and production framework

28 established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792,

794 (1973), see Shelley v. Geren, 666 F.3d 599, 607 (9th Cir. 2012) (noting that "nothing in Gross overruled our cases utilizing this framework to decide summary judgment motions in ADEA cases").[3]  California courts look to federal precedent when interpreting FEHA because of its similarity to the ADEA.  Guz v. Bechtel Nat'l, Inc., 24 Cal.4th 317, 354 (2000).  To analyze FEHA claims, courts use the McDonnell Douglas burden-shifting framework and other federal employment law principles.[4]  See Schechner v. KPIX-TV, 686 F.3d 1018, 1023 (9th Cir. 2012); Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

Plaintiff and defendants analyze plaintiff's claims of discrimination based on age under the McDonnell Douglas framework.  Under that framework, plaintiff must first establish a prima facie case of age discrimination.  Shelley, 666 F.3d at

[3]   Only at trial does the plaintiff have the burden of proving that age was the cause in fact of the adverse employment action.  Shelley, 666 F.3d at 608.

[4]   The parties did not address whether Harris effected any change in the court's analysis of a FEHA age-discrimination claim at the summary judgment stage.  Harris was a mixed-motives case. At trial, the defendant asked for an instruction that if the jury found a mix of discriminatory and legitimate motives, it could avoid liability by proving that a legitimate motive alone would have led it to make the same decision to terminate plaintiff. Harris, 56 Cal. 4th at 211.  The California Supreme Court noted that "[i]n FEHA employment discrimination cases that do not involve mixed motives, we have adopted the three-stage burden-shifting test established by McDonnell Douglas . . . ." Id. at 215.  Because there is no evidence before the court at this stage that suggests a mixed motive on the part of the College, it proceeds under the McDonnell Douglas framework for the purposes of resolving the instant motion.  See McFarland v. Sears Holdings Mgmt., C 11-4587 PJH, 2013 WL 1333720, at *3 (N.D. Cal. Mar. 29, 2013) (applying McDonnell Douglas framework to FEHA claim post-Harris).  This is consistent with the Ninth Circuit's practice, noted above, of applying the framework to decide summary judgment motions on ADEA claim after Gross.

608.  If successful, the burden of production shifts to
defendants to articulate a legitimate nondiscriminatory reason
for the adverse employment action.  Id.  Plaintiff then must
"demonstrate that there is a material genuine issue of fact as to
whether the employer's purported reason is pretext for age
discrimination."  Id.

To make out a prima facie case of age discrimination,
plaintiff must show that he: (1) was a member of the protected
class (aged forty or older); (2) was performing his job
satisfactorily; (3) was discharged; and (4) was replaced by a
substantially younger employee with equal or inferior
qualifications.  Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133, 142 (2000); Rose v. Wells Fargo & Co., 902 F.2d 1417,
1421 (9th Cir. 1990).

1.  Plaintiff's Prima Facie Case

The parties dispute whether plaintiff can satisfy the
second and fourth elements of the prima facie case.  As to the
second factor, defendants argue that plaintiff was not performing
his job satisfactorily for the same reasons that allegedly
prompted his termination: he created a conflict of interest by
hiring faculty to work in his private pharmacy, treated another
faculty member inappropriately, and vented his frustrations about
the College's administration during a visit from an accreditation
organization.  (See Mem. in Supp. of Mot. at 11:23-14:4 (Docket
No. 29-1).)

To satisfy the second element, plaintiff offers
evidence that he received a four percent merit increase in pay in
2010 and that his supervisor rated his performance as good to

7

1  excellent.[5]  (Brazill Decl. ¶ 4; Hawkins Dep. at 26:22-27:9,

2  79:18-19.)  Plaintiff's proffer gives rise to a dispute of fact

3  whether he was performing his job satisfactorily.  The court

4  therefore finds that plaintiff has satisfied the second element

5  of the prima facie case.  See Douglas v. Anderson, 656 F.2d 528,

6  533 n.5 (9th Cir. 1981) ("In establishing a prima facie case,

7  [plaintiff] need only produce substantial evidence of

8  satisfactory job performance sufficient to create a jury question

9  on this issue.").

10        As to the fourth element, both parties seem to agree

11  that to determine whether a plaintiff has been replaced by a

12  substantially younger employee, a court should look to the age of

13  the plaintiff's permanent replacement.  Indeed, courts have shown

14  a reluctance to allow an employer to defeat the employee's prima

15  facie case by pointing to the fact that it replaced plaintiff

16  with a temporary, or interim, employee who fell within the same

17  protected class.[6]  The question of whether an employee is

18

19        [5]    The court does not rely on Hawkins' testimony for the
20  fact that plaintiff received a raise, but instead for the point
    that had plaintiff received a raise, it would be merit-based.
21  Defendants' objections to Hawkins' testimony are therefore
    overruled.

22        [6]    See McCarthy v. N.Y. City Technical Coll., 202 F.3d
23  161, 165 (2d Cir. 2000) ("Replacement by an older person may not
    necessarily be fatal to an age discrimination claim if, for
    example, a plaintiff can show that his age was the true
24  motivation and the older replacement was hired temporarily as a
    means of insulating defendant from ADEA liability."); Greene v.
25  Safeway Stores, Inc., 98 F.3d 554, 561 (10th Cir. 1996)
    (concluding a fifty-two year old plaintiff, who was replaced by a
26  fifty-seven year old employee, presented sufficient evidence that
    the plaintiff's age was a motivating factor in his termination,
27  where there was sufficient evidence to infer that the replacement
    was hired to be a defense against any age discrimination claim by
28  the plaintiff); Alphin v. Sears, Roebuck & Co., 940 F.2d 1497,

temporary or permanent, however, is always relative.  No

employment relationship lasts forever, and in a sense all

employment, like everything else, is temporary.

Here, it is not the employer who attempts to defeat

plaintiff's prima facie case by pointing to the age of his

immediate replacement.  Rather, it is the employee who asks the

court to consider Frausto as his replacement for purposes of

establishing a prima facie case.  In these circumstances, the

court perceives the distinction between temporary and permanent

employment to be less significant.  Although some courts in these

kinds of cases have still looked only to the age of the permanent

replacement,[7] other courts have considered the age of the

1499–1501 (11th Cir. 1991) (finding a fifty-year old plaintiff
established a prima facie case of age discrimination, despite
being replaced by an older employee, where he was told that he
had been around "too long," was "too old," and was "making too
much money" and the older replacement employee resigned after
only one day and was replaced by a twenty-four year old trainee).

[7]  See Lewis v. St. Cloud State Univ., 467 F.3d 1136 (8th
Cir. 2006) (where dean of university alleging age discrimination
was temporarily replaced by an associate dean six-and-a-half
years younger and permanently replaced by a man only two-and-a-
half years younger, the court explained that the former dean
could not establish a prima facie case because "the important
datum here is the age of the person whom the [u]niversity chose
as [his] permanent replacement"); Potera-Haskins v. Gamble, 519
F. Supp. 2d 1110, 1118-19 (D. Mont. 2007) (female plaintiff
alleging sex discrimination could not make prima facie case where
permanent replacement was also female, even though temporary
replacement was male, because a national search to find best
qualified person was both reasonable and necessary); Sheets v.
Nat'l Computer Sys., Inc., Civ. No. 3-99-30091, 2000 WL 33364120,
at *6 (S.D. Iowa Dec. 7, 2000) ("The limited case law in this
area suggests the Court should look to the permanent replacement
employee, not the temporary fill-in."); Ashagre v. Southland
Corp., 546 F. Supp. 1214, 1219 (S.D. Tex. 1982) (in Title VII
race discrimination case, looking to permanent replacement rather
than temporary replacement in determining whether prima facie
case was established).

1  temporary replacement for purposes of determining whether

2  plaintiff has made a prima facie case.[8]  Where the employer

3  replaces the plaintiff with either a temporary or permanent

4  employee outside of the plaintiff's protected category, an

5  inference of discriminatory intent may arguably be drawn.

6         Here, the court concludes that whether Frausto is to be

7  considered a temporary or permanent replacement of plaintiff is a

8  disputed issue of ultimate fact which is subject to conflicting

9  interpretations.  According to the evidence proffered by

10 defendants, Dean Hawkins had responsbility for finding a

11 replacement for plaintiff.  (See Hawkins Dep. at 55:22-56:9,

12 57:24-58:1.)  He explained that "what we do when something like

13 this happens, we have to appoint an interim department chair

14 while we search for a full-time department chair." (Id. at

15 55:19-21.)  After no other faculty expressed interest in assuming

16 the position, Frausto testified that she accepted it on a

17 temporary basis while Dean Hawkins searched for a permanent

18 replacement.  (See Frausto Dep. at 15:12-17, 16:7-8, 136:12-18;

19 see also Hawkins Dep. at 55:8-13.)  Dean Hawkins was assisted by

20 the other department chair and the associate deans.  (Hawkins

21 _____

22       [8]    See Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307,
   317-18 (6th Cir. 2007) ("We find that the fourth element of the
23 prima facie case in an age discrimination case can be met even
   where the new hire, who is a member of the non-protected class,
24 has the title of 'temporary' employee.  In cases where the new
   hire takes on the plaintiff's former job responsibilities, merely
25 designating the new hire 'temporary' will not defeat the fourth
   element."); Cyprian v. Auburn Univ. Montgomery, 799 F. Supp. 2d
26 1262, 1280 (M.D. Ala. 2011) (where terminated plaintiff's duties
   were initially split by one temporary employee belonging to her
27 protected class and another temporary employee outside her
   protected class, plaintiff could demonstrate that she was
28 replaced, at least in part, by a person outside her protected
   class for purposes of the prima facie case).

1   Dep. at 58:5-7.)

2           After a period of time and "having met and talked to

3   [Palmieri] several times, [Dean Hawkins] realized that he would

4   serve the college well by taking on the position of department

5   chair . . . ." (Id. at 58:12-15.)  Dean Hawkins then appointed

6   Palmieri to plaintiff's former position on, what he testified to

7   be, a permanent basis.  (Id. at 58:8-24.)

8           On the other hand, plaintiff contends that the College

9   replaced Frausto with Palmieri only after he complained to the

10  Equal Employment Opportunity Commission ("EEOC") and the

11  Department of Fair Employment and Housing ("DFEH") about age

12  discrimination.  (Opp'n at 8:23-25 (Docket No. 30).)  Plaintiff

13  filed his age discrimination claims with the EEOC and DFEH in

14  January and February of 2012.[9]  (Brazill Decl. ¶ 13.)  Although

15  it is clear that Frausto was appointed to the chair position on

16  August 1, 2011, no party has indicated to the court exactly when

17  Palmieri assumed the position.[10]  (See Hawkins Dep. at 59:21-22

18  (could not recall how long Frausto was in the interim position,

19  but may have been six months).)

20          Plaintiff also argues that "Palmieri was installed

21  rather quickly compared to how [p]laintiff was hired."  (Opp'n at

22  9:1.)  Plaintiff draws this conclusion from Dean Hawkins'

23  testimony that "having met and talked to [Palmieri] several

24  times, I realized that he would serve the college well by taking

25

26          [9]   Defendants' objections on the grounds of foundation and
    relevance to the evidence underlying this fact are overruled.

27          [10]  The emails from student Chike Okolo,(Brazill Decl. Exs.
    B, C), do not establish when Palmieri was appointed to the chair
28  position.

                                    11

on the position of department chair, which he willingly did."
(Hawkins Dep. at 58:12-15.)   Plaintiff notes that, in contrast,
when he was hired for the same position, he met with Dean Hawkins
several times, gave a presentation to the faculty, faculty
provided feedback on his appointment, Dean Hawkins recommended
the hire, and then the College president and Board of Trustees
approved the recommendation.   (Id. at 19:22-25, 21:6-18
(describing what would have been the process for hiring
plaintiff).)   It is unclear whether Dean Hawkins' statement
regarding Palmieri is intended to be a complete description of
how Palmieri was hired.   However, the statement--in conjunction
with the evidence of plaintiff's complaints to the EEOC and DFEH-
-does allow for the inference that the College quickly replaced
Frausto with Palmieri once it became concerned that plaintiff was
alleging that he had been terminated because of his age.   From
that, it might also be inferred that Frausto's position was
really permanent and only later labeled "temporary" to avoid
charges of age-based discrimination.

        The College responds that it "undertook a thoughtful
application and interview process to select" Palmieri.   (Mem. in
Supp. of Mot. at 14:19-20.)   It also argues that it immediately
began looking for a permanent replacement for plaintiff after his
termination.   (Reply at 3:14-19 (Docket No. 31).)   The College,
however, offers no evidence of such a process or a of search
immediately commencing for someone to permanently replace

///

///

///

                                12

plaintiff after it placed Frausto in his former position.[11]   The
absence of such evidence is consistent with the inference that
Frausto was intended to be plaintiff's permanent replacement.

Considering the evidence in the light most favorable to
plaintiff, as the court must, there is a question of fact that
Frausto--who is substantially younger than plaintiff--was really
a permanent replacement for plaintiff and was only given the
"interim" title so that the College could insulate itself from
charges of age discrimination.  By raising this factual issue,
plaintiff has produced enough evidence to meet the fourth element
of the prima facie case.  See Wallis v. J.R. Simplot Co., 26 F.3d
885, 889 (9th Cir. 1994) ("The requisite degree of proof
necessary to establish a prima facie case for . . . ADEA claims
on summary judgment is minimal and does not even need to rise to
the level of a preponderance of the evidence.").

2.  Nondiscriminatory Reasons

Because plaintiff has established a prima facie case of
age discrimination, the burden of production now shifts to
plaintiff's employer, the College, to articulate a legitimate
nondiscriminatory reason for his termination.  Shelley, 666 F.3d
at 608.  The College identifies three explanations for its
decision to terminate plaintiff.  They are (1) that plaintiff
inappropriately vented his frustrations with the College's
administration during a visit by an accreditation organization;
(2) that plaintiff created a conflict of interest by hiring

_____

[11]   Hawkins' testimony describing what the College would do
in a situation where a department chair was terminated is not
evidence of when he began the search to fill plaintiff's
position.  (See Hawkins Dep. at 55:19-21.)

faculty to work in his private pharmacy; and (3) that plaintiff retaliated against an employee.  (See Cheung Decl. ¶ 14.)  By articulating these explanations, the College has satisfied its burden of producing a legitimate, nondiscriminatory reason for its adverse employment action.  Plaintiff retains the burden of persuasion and must show that the College's proffered reasons are pretext.  Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1127 (9th Cir. 2000).

### 3. Pretext

Plaintiff may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)); see Coghlan v. Am. Seafoods Co. LLC., 413 F.3d 1090, 1094 (9th Cir. 2005).

If plaintiff offers indirect evidence that "tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable," such evidence must be "specific" and "substantial" in order to create a triable issue of fact as to whether the College had a discriminatory motivation.  Godwin, 150 F.3d at 1222; see Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 (9th Cir. 2006).

In contrast, if plaintiff offers direct evidence of discriminatory motive, he can show there is a triable issue as to the actual motivation of the College, even if the evidence is

14

1  "very little."  Godwin, 150 F.3d at 1221 (internal quotation

2  marks and citation omitted) (explaining that direct evidence is

3  that which proves discriminatory animus without inference or

4  presumption).

5         The court first considers plaintiff's indirect

6  evidence.  First, with regard to the claim that plaintiff

7  inappropriately vented his frustrations with the College's

8  administration during a visit by an accreditation organization,

9  President Cheung testified that when the Western Association of

10  Schools and Colleges ("WASC") visited the College as part of the

11  accreditation process in October of 2010, plaintiff

12  inappropriately expressed his opinion that the College was not

13  providing his department with sufficient faculty.  (Cheung Decl.

14  ¶ 13.)

15         Plaintiff responds that his observations were well

16  founded and states that he "did not act inappropriately in front

17  of WASC, nor did [he] tell Dean Hawkins that [he] acted

18  inappropriately."  (Brazill Decl. ¶ 7.)  He offers evidence that

19  the administration's failure to provide enough resources to hire

20  sufficient faculty to support the College's experiential

21  education program stymied its full development.  (Brazill Dep. at

22  163:6-164:9.)  Dean Hawkins likewise testified that he did not

23  believe that the administration had given him as much support in

24  hiring faculty as they should have, even though additional

25  faculty were needed to conduct the program.  (Hawkins Dep. at

26  36:14-24.)  Plaintiff also explains that while meeting with WASC,

27  he merely agreed with the statement of the director of

28  experiential education who reported that the College did not have

15

1  adequate resources to meet the needs of fourth-year students.[12]
2  (Brazill Decl. ¶ 7.)

3          Second, with regard to the claim that plaintiff created
4  a conflict of interest by hiring faculty members, whose work
5  plaintiff oversaw at the College, to work in his private
6  pharmacy, plaintiff notes that other faculty were working
7  additional jobs.  In response, the College explains that none of
8  those other moonlighting opportunities created the conflict that
9  concerned the College administration, namely that the faculty
10 member would be "evaluating the chair and getting paid by the
11 chair to work in his or her pharmacy."  (Hawkins Dep. at
12 98:19-20; see id. at 97:23-98:16.)  It does not appear, however,
13 that the College attempted other, less drastic, steps, such as
14 instructing plaintiff not to employ the faculty members in his
15 pharmacy, prior to deciding to terminate him.

16         Third, with regard to the claim that plaintiff
17 retaliated against an employee, according to President Cheung,
18 plaintiff had asked another faculty member, Dr. Grant Lackey,
19 about investing in his pharmacy.  (Cheung Decl. ¶ 13.) After
20 Lackey declined to invest, the College believed that plaintiff
21 began retaliating against him by reporting two incidents in June
22 2011 to the College's human resources department involving
23 allegedly inappropriate conduct by Lackey.  (Vera Decl. ¶ 7.)
24 The director of human resources at the College, Jasmin Vera, also
25 stated that plaintiff was in her "office at least once per week,

26

27         [12]   Defendants' objections on the grounds of foundation,
   relevance, and improper opinion testimony to the evidence
28 underlying this fact are overruled.

                              16

1  if not more, wanting Dr. Lackey to be fired, or some other form

2  of punitive action taken against him." (Id.)

3         After investigating Lackey's purported misconduct, Vera

4  found the claims against him to be unsubstantiated and concluded

5  that plaintiff was retaliating against him. (Id. ¶ 8.) She also

6  reported that she learned in early July 2011 that although

7  another faculty member purportedly told an off-color joke,

8  plaintiff did not report that incident and chose not to reprimand

9  that individual. (Id. ¶ 9.)

10        Plaintiff explains that the potential partnership

11 between them did not affect his treatment of Lackey, especially

12 because Lackey was still considering becoming a partner two days

13 before plaintiff's termination.[13] (Brazill Decl. ¶ 9.)

14 Plaintiff further explains that he only reported Lackey's making

15 offensive jokes to the College's resources department after Dean

16 Hawkins told him to report the conduct.[14] (Id. ¶ 8.) He also

17 denies complaining to Vera on a weekly basis about Lackey or

18 requesting that he be fired or investigated. (Id.)

19        Plaintiff's account of his treatment of Lackey could

20 give rise to the inference that, contrary to the College's

---

21

22 [13]   Defendants' objections on the grounds of foundation,
   relevance, hearsay, and improper opinion testimony to the
23 evidence underlying this fact are overruled.  The sham affidavit
   rule does not apply here because there is no inconsistency
24 between plaintiff's testimony that he and his wife had decided
   that Lackey would be an inappropriate business partner, (Brazill
25 Dep. at 187:17-24), and plaintiff's later testimony that he never
   advised Lackey that he had rejected him as a partner and that
26 their discussions stopped after plaintiff was terminated,
   (Brazill Decl. ¶ 9).

27 [14]   Defendants' objections on the grounds of foundation,
   relevance, hearsay, and improper opinion testimony to the
28 evidence underlying this fact are overruled.

contention, plaintiff did not treat Lackey differently than any
other faculty members.  Such an inference creates a genuine issue
of fact as to whether the College's final reason for firing
plaintiff is worthy of credence.

"'[F]undamentally different justifications for an
employer's action . . . give rise to a genuine issue of fact with
respect to pretext since they suggest the possibility that
neither of the official reasons was the true reason.'"  Aragon v.
Republic Silver State Disposal Inc., 292 F.3d 654, 661 (9th Cir.
2002) (quoting Washington v. Garrett, 10 F.3d 1421, 1434 (9th
Cir. 1994)).  Similarly, the College's inclusion of a potentially
untenable explanation to its reasons for terminating plaintiff
casts doubt over the overall credibility of its reasons.  It
gives rise to the inference that the College is attempting to
dissemble a discriminatory motive for terminating plaintiff with
other plausible justifications.

In other words, it suggests pretext.  Plaintiff's
circumstantial evidence is thus sufficient to raise a genuine
issue of material fact whether the College's nondiscriminatory
explanations were the true reason for his termination or whether
they were merely guises for a discriminatory motive.

Even if plaintiff had not produced sufficient
circumstantial evidence of pretext to create a triable issue as
to the actual motivation of the College, he has presented
sufficient direct evidence of discrimination to do so.  As direct
evidence of discrimination, plaintiff points to his testimony
that he learned from two administrative assistants that President
Cheung had stated in a meeting that he preferred working with

1   younger workers who had energy and could keep up with him.

2   (Brazill Dep. at 74:11-20.)   Brazill did not personally hear

3   President Cheung state this alleged preference.   (Id. at 74:21-

4   75:1.)   Plaintiff also testified that Dean Hawkins told him that

5   President Cheung felt that one of Dean Hawkins' assistants was

6   too old and attempted to replace her with a younger assistant.

7   (Id. at 79:4-18.)   He did not hear President Cheung say that Dean

8   Hawkins' assistant was too old.   (Id. at 79:19-21.)

9          "A trial court can only consider admissible evidence in

10  ruling on a motion for summary judgment."   Orr v. Bank of Am., NT

11  & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Pro.

12  56(e).   Plaintiff's testimony regarding what the administrative

13  assistants told him constitutes double hearsay.   While President

14  Cheung's statement may fall within an exception to the hearsay

15  rule, see Fed. R. Evid. 801(d)(2)(D) (statement is not hearsay

16  when offered against an opposing party and "was made by the

17  party's agent or employee on a matter within the scope of that

18  relationship and while it existed"), the assistants' recounting

19  of President Cheung's alleged bias does not.

20          The other evidence, however, could be presented in

21  admissible form at trial.   In Nesbit v. Pepsico, Inc., 994 F.2d

22  703 (9th Cir. 1993), the Ninth Circuit held that a supervisor's

23  comment that "'[w]e don't necessarily like grey hair" in a

24  meeting "was uttered in an ambivalent manner and was not tied

25  directly to [the plaintiff's] termination" and thus "[wa]s at

26  best weak circumstantial evidence of discriminatory animus"

27  toward the plaintiff.   Nesbit, 994 F.2d at 705; see also Nidds v.

28  Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996)

1  (supervisor's comment that he intended to get rid of "old timers"

2  did not create an inference of age discrimination because it was

3  not directed at plaintiff and was ambiguous because "it could

4  refer as well to longtime employees or to employees who failed to

5  follow directions as to employees over 40").

6          In contrast, while here President Cheung's comment

7  about Dean Hawkins' assistant and his attempt to replace her with

8  a younger worker are not directly tied to plaintiff's

9  termination, they constitute unambiguous evidence of

10  discriminatory animus connected to employment decisionmaking,

11  rather than mere evidence of discrimination "in the air."  See

12  Harris, 56 Cal.4th at 231.  Significantly, President Cheung is

13  the College official who made the decision to terminate

14  plaintiff.  (Cheung Decl. ¶¶ 13, 16.)  Such direct evidence is

15  sufficient to create a triable issue whether the College's

16  articulated reason for terminating plaintiff is pretextual.  See

17  Godwin, 150 F.3d at 1221 (9th Cir. 1998) ("When the plaintiff

18  offers direct evidence of discriminatory motive, a triable issue

19  as to the actual motivation of the employer is created even if

20  the evidence is not substantial.  As we said in Lindahl, it need

21  be 'very little.'").

22          Plaintiff has established a disputed issue of fact,

23  through either indirect or direct admissible evidence, as to

24  whether he was terminated because of his age.  Accordingly, the

25  College's motion for summary judgment as to plaintiff's claims

26  for age discrimination under the ADEA and FEHA must be denied.

27      B.   FCA: Retaliation

28          The FCA protects employees from being "discharged,

demoted, . . . or in any other manner discriminated against in
the terms and conditions of employment . . . because of lawful
acts done by the employee . . . in furtherance of an [FCA] action
. . . or other efforts to stop [one] or more violations of [the
FCA]."  31 U.S.C. § 3730(h).[15]  "An FCA retaliation claim
requires proof of three elements: '(1) the employee must have
been engaging in conduct protected under the Act; (2) the
employer must have known that the employee was engaging in such
conduct; and (3) the employer must have discriminated against the
employee because of her protected conduct.'"  United States ex
rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1060
(9th Cir. 2011) (quoting U.S. ex rel. Hopper v. Anton, 91 F.3d
1261, 1269 (9th Cir. 1996)); see Mendiondo v. Centinela Hosp.
Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).

As evidence that he engaged in protected conduct under
the FCA, plaintiff states that he spoke several times with Dean
Hawkins about the practice of College students using federal
financial aid they received to pay for their expenses at
Davenport University to pay for College tuition and told the Dean

---

[15]   Congress recently made several changes to the
retaliation provision of the FCA.  Effective May 20, 2009, the
Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, §
4(d), 123 Stat 1617 (2009), amended § 3730(h) to protect
employees from being "discharged, demoted, . . . or in any other
manner discriminated against in the terms and conditions of
employment . . . because of lawful acts done by the employee . .
. in furtherance of other efforts to stop [one] or more
violations of this subchapter."  In an apparent measure to
correct the odd choice of the word "other," the Dodd-Frank Wall
Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §
1079A(c)(1), 124 Stat. 1376 (2010), again amended § 3730(h) to
protect employees who have acted "in furtherance of a[] [FCA]
action" or that have taken "other efforts" to stop violations of
the FCA.

1   that the practice is "illegal." (Brazill Decl. ¶ 15; Brazill

2   Dep. at 193:7-9.) He also asked the College's Associate Dean,

3   Cyndi Porter, and employee Patty Erck "what they thought about

4   students using Davenport money to pay for College . . .

5   expenses."[16] (Brazill Decl. ¶ 15; Brazill Dep. at 67:19-68:21,

6   71:2-72:14.) He asked the same to Registrar Lisa Erck. (Brazill

7   Decl. ¶ 15; Brazill Dep. at 154:16-20.)

8          Assuming that these actions constitute protected

9   activity under the FCA, plaintiff has not established a prima

10  facie case of retaliation. Because plaintiff was fired two

11  months after he last approached Dean Hawkins about College

12  students using Davenport University financial aid to pay for

13  College expenses (Brazill Decl. ¶ 15.), he contends that the

14  temporal proximity between his protected activity and his

15  termination is <u>alone</u> sufficient to raise an inference that he was

16  terminated because of any protected activity. (<u>See</u> Opp'n at

17  13:23-25.) Plaintiff is wrong.

18         In the retaliation context, the Ninth Circuit has held

19  that when adverse employment decisions are taken within a close

20  proximity after protected activity has been made, causation may

21  be inferred. <u>See, e.g.</u>, <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080,

22  1094 (9th Cir. 2008); <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281

23  F.3d 1054, 1065 (9th Cir. 2002); <u>Passantino v. Johnson & Johnson</u>

24  <u>Consumer Prods., Inc.</u>, 212 F.3d 493, 507 (9th Cir. 2000). The

25  Ninth Circuit has found a prima facie case of causation, for

26

27         [16]   Defendants' objections on the grounds of hearsay,

28  foundation, and relevance to the evidence underlying this fact
    are overruled.

example, when adverse employment actions were taken more than two months after an employee filed an administrative complaint, and more than a month and a half after the employer's investigation ended. <u>Davis</u>, 520 F.3d at 1094.  There is, however, an exception to this general principle: "[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." <u>Brungart v. BellSouth Telecomms., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000); <u>Thomas v. City of Beaverton</u>, 379 F.3d 802, 812 n.4 (9th Cir. 2004) ("The employer's awareness of the protected activity is also important in establishing a causal link."); <u>Maarouf v. Walker Mfg. Co.</u>, 210 F.3d 750, 755 (7th Cir. 2000) (mere proximity between complaints of discrimination and termination insufficient to avoid summary judgment on plaintiff's retaliation claim where plaintiff could not raise a disputed issue of fact as to whether the decision maker was aware of his discrimination allegations at the time); <u>Cohen v. Fred Meyer, Inc.</u>, 686 F.2d 793, 797 (9th Cir. 1982) (no causal link where the decision maker did not know that plaintiff had recently engaged in protected activity).

There is no evidence from which a trier of fact could find that plaintiff's alleged protected activity played any role in the decision to terminate him.  President Cheung was the person with the decision-making power over whether plaintiff kept his position.  (<u>See</u> Cheung Decl. ¶¶ 13, 16 (stating that he made the decision to terminate plaintiff).)  The undisputed evidence is that plaintiff never addressed his concerns about the tuition

23

scheme to President Cheung or Vice President Fong.  (Brazill Dep.
at 141:7-13, 142:4-8; Cheung Decl. ¶ 12; Fong Decl. ¶¶ 3-4.)
Dean Hawkins testified that he could not even recall whether
plaintiff brought his concerns to his attention.  (Hawkins Dep.
at 50:3-5.)  President Cheung and Vice President Fong both
testified that they were not aware that plaintiff had expressed
such concerns to Dean Hawkins or anyone else and that Dean
Hawkins did not tell them that plaintiff expressed such concerns.
(Cheung Decl. ¶ 12; Fong Decl. ¶ 5.)  Thus, there is no evidence
to oppose President Cheung's testimony that when he terminated
plaintiff he did not know about plaintiff's reports to Dean
Hawkins that the practice of some students of using Davenport
student aid to pay for College expenses is illegal.

        Further, plaintiff has not offered any theory to
explain how President Cheung learned of his complaints, except to
assert that his lack of knowledge is "implausible," (Opp'n at
13:13), and that plaintiff witnessed Vice President Fong telling
students that Davenport was an alternate way to pay for the
College, (Brazill Dep. at 151:18-25).  Plaintiff has also failed
to offer any "non-speculative evidence of specific facts" to give
rise to any inference that President Cheung knew about his
complaints.  Cafasso, 637 F.3d at 1061.  While it is plausible
that President Cheung somehow found out about plaintiff's
complaints, plaintiff has offered no evidence to give rise "to a
reasonable inference that it did in fact occur."  Id.  He did not
rebut the evidence showing that President Cheung did not have
knowledge that plaintiff was engaged in protected conduct and
thus cannot rely on temporal proximity alone to create a genuine

24

1  issue of fact as to causation.  Accordingly, the College's motion
2  for summary judgment as to plaintiff's claim for retaliation
3  under the FCA must be denied.

4        C.   <u>Wrongful Termination in Violation of Public Policy</u>

5          Because the court concludes that genuine issues of
6  material facts exist regarding plaintiff's age discrimination
7  claims under the ADEA and FEHA, the court will deny the College's
8  motion for summary judgment as to plaintiff's claim for wrongful
9  termination in violation of public policy.  <u>See</u> <u>Earl</u>, 658 F.3d at
10 1118 ("Because [plaintiff's] discrimination claim under FEHA
11 survives summary judgment, so too does her claim for wrongful
12 termination in violation of public policy.").

13         IT IS THEREFORE ORDERED that California Northstate
14 College of Pharmacy, LLC's motion for summary judgment be, and
15 the same hereby is, DENIED as to plaintiff's ADEA, FEHA, and
16 wrongful termination in violation of public policy claims and
17 GRANTED as to plaintiff's FCA claim.

18         IT IS FURTHER ORDERED that California Northstate
19 University, LLC's motion for summary judgment be, and the same
20 hereby is, GRANTED.

21 DATED:   June 4, 2013

22

23 _____
24 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

25

26

27

28